There are a number of issues raised in this appeal. I'd like to begin with the issue of the playback of the videotape recordings during the jury's deliberations. This court's case law has made very clear that if the court is going to allow a playback or readback of evidence during deliberations, the court has to take precautions to ensure that the jury does not give undue emphasis to that evidence. And in particular, as was requested in this case, to give an instruction to the jury not to give undue emphasis. And the government in this case even recognized the need for that instruction, agreed that it should be given, asked the court to do it. But the judge did not. And in this case, that was reversible error. What exactly was in those tapes that was replayed? These were the tape recordings of the undercover meetings, the second, third, and fourth undercover meetings between the agents and Dr. Bamdad. So there were excerpted portions of the meetings that were not the entire meetings. Were they the same excerpts that were played in the trial or were they, as it were, excerpts of what had been played in the trial, excerpts of excerpts? Yes. I believe that the excerpts had all been played during the trial. So it was precisely what had been played during the trial. They were played at different points during the testimony. They were played initially during Jeff O'Neill's testimony. Then excerpts of the excerpts were played at different points during the trial. Excerpts were played again during Agent O'Neill's and Agent Strapple, Agent Gardner's testimony. And then again during the cross-examination, certain excerpts were played. And then in closing argument, the government played all the excerpts again. So it sounds as though the juror had to be almost brain-dead not to have remembered them. So I guess the question is, why do they want to see them again? Well, I think that's an excellent point, Your Honor. And the closing argument had just been the previous court day. I think it may have been a Friday before a Monday recess. But still, it had been almost the last thing that the jurors had heard, and they had heard these tapes many times during the trial. So let me make sure that the tapes that were replayed, were they all of those tapes that were replayed, had they been played during closing argument? My understanding is yes. And perhaps the government can correct me if I'm wrong about that. I believe that is the case. At least the transcript reflects that the tapes were played in their entirety during the closing. And I think the issue here is really whether this could be considered harmless error. The objection was raised. The instruction was asked for. So this error was preserved. So unlike in Newhoff and Stinson, relied upon by the government, where the defendant was faced with a plain error standard of review and bore the burden of proving an effect on substantial rights, here the government bore the burden of proving the harm or bears the burden of showing the harmlessness of the error. And we just simply cannot say that this error was harmless. Why not? Because these tapes were really, these videotapes were the linchpin of the government's case. These were emphasized throughout the closing argument, as we just discussed. They were played repeatedly throughout the trial, repeated in closing argument. But that was not the only evidence the government had. No, it wasn't the only evidence. But it was certainly emphasized by the government to a great extent. And in their closing, for example, they said, you know, how do you know the defendant was acting outside of professional practice and without a legitimate medical purpose, the critical issue in the case, the only issue in the case? Well, you heard from under-recovery agents, and you heard exactly and saw exactly what happens inside a defendant's examination room. But there was also expert testimony that this practice was outside the medical norms. There was, which was subject to extensive cross-examination. And even the expert admitted that most of the things that he was testifying about were guidelines, were not requirements, did not necessarily mean that, you know, these prescriptions were not legitimate. He testified, for example, that you have to believe the patient. He testified that it is permissible under certain circumstances to prescribe to people, to patients, even if the doctor knows that they are addicted. So there were significant, you know, issues with Dr. Chavez. And, in fact, in the closing, the government even told the jury, look, you know, you heard from Dr. Chavez, but you don't have to even, you know, believe him or listen to him because you have the recordings. You can see for yourself. And this is at GER, page 1677. You can see for yourself what the defendant did by just looking at the videotapes. So the government itself, and that was immediately before they played the tapes, the government itself told the jury, these are, this is the primary evidence. This is what you should really be looking at. So that really differentiates Newhoff and Simpson and brings this case within the other cases, Binder, Richard and Hernandez, where the evidence that was replayed was key evidence, core of the government's case. And without these, and these undercover meetings, of course, themselves were very important. Otherwise, the government was left with circumstantial evidence based on a number of prescriptions and immunized testimony. And as to some of the, many of those counts, the jury hung. They convicted on every count for which there was an undercover recording. And I think another significant point on why this was not harmless error, something that's emphasized in the case law also, is that these were only selected portions. These tapes were only selected portions of the meetings, selected by the government. Did the jury have not only the tapes, but a transcript of the tapes? Transcripts were supplied to them during the trial, but they did not have that. The reason I ask that is that, as I understand it, the tapes were actually quite difficult to understand. And the jury had been instructed that the transcripts were merely evidence of what had been said, and that the evidence to which they really had to pay attention was the tapes rather than the transcripts. And as I, it's almost explicit in what Judge Wu said. It's certainly implicit in what he said. If he gives an instruction that says you're not to place undue influence or undue importance upon the tapes, that may have the effect of negating the other instruction, which is the proper instruction, which is to say, don't place undue evidence on the transcripts, because the real evidence is the tapes. So what's he supposed to do? Well, that's an interesting question, Arnold, although I don't think that his comment was specifically directed at the transcript issue. They didn't have the transcripts in the jury room at that point. So there really wasn't a... So they'd seen the transcripts? They had seen them. I think they had seen them at the time that the tapes were playing. Then they could have asked for a readback of the transcripts, I guess, or a review of the transcripts. Right, they would have asked for copies of the transcripts, which might have been more problematic if they had said, well, we want to see these transcripts, which they've now been instructed they're not supposed to be, considering it's the evidence. But that's not what they asked for. They did ask for the tapes, yeah. Right. Now, of course, I've not heard the tapes, but they're described by Judge Wu as very difficult to understand. I think he says almost unintelligible. And he says it's not surprising to me that they want to re-hear them because they're hard to understand. He does say that. Would you disagree with that? I would to some extent. I mean, I have listened to the tapes, and they are possible to understand. And certainly they are possible to understand after they have had the benefit of hearing them multiple times and with the benefit of the transcripts during the trial. So that really does lead to why do they really need to hear them again when they have had this opportunity many times to have the transcripts, have the tapes, excuse me, with the benefit of the transcripts. And one other point I just wanted to make on this issue is just to bear in mind that these were not the entirety of the meetings. And one significant omission was the first meeting between Agent O'Neill and Dr. Bomdod. That one they did not have read back. That was played back. It was an audio recording. And there were significant things that occurred during that initial meeting. Most significantly, he described the shoulder pain. That wasn't even on the audio tape, but that came out during the testimony. He did describe shoulder pain. Dr. Bomdod did examine his arm. They had a conversation about it. Agent O'Neill asked for 80-milligram strength. Dr. Bomdod refused to give him that strength. Were you trial counsel? I'm sorry? Were you trial counsel? No, I was not. Do you know whether or not trial counsel asked for the entirety of the tapes to be admitted? He did not. He cross-examined the agents at length about the fact that not all the entirety of the meetings were recorded on the tapes. And so he did get testimony in the record about what was left out, including, for example, the description of the shoulder pain and the examination during Agent O'Neill's testimony, and that these were much longer meetings. I mean, the excerpts made it seem like they were only a couple minutes long, but these were much longer meetings. So are you saying that the meetings were not recorded in their entirety, just snippets of the meetings were recorded? Is that what you're saying? They were recorded, but only excerpts were admitted into evidence. Okay. So but the defense could have had the balance of the tapes admitted into evidence, right? It could have. True. True. But the point, I guess, here is that the jury, when they were hearing this playback, was hearing only selected portions. They did not hear the cross-examination, for example, that pointed out that these were only excerpts. And what else happened? That was testimony as opposed to the actual tapes, right? Right. Well, one of the issues that comes up in the case law is that if you're going to have a readback, you've got to do direct and cross, for example. And there was, of course, no cross-examination. That's mixing apples and oranges because you're talking about testimony as opposed to the videotapes. So if part of the videotapes are played, then all of them should be played. If part of testimony is read back, all of the testimony is read back, but you're mixing those two. Well, I mean, maybe mixing, but I think the point is that the danger, there's an inherent risk and undue emphasis that is presented here by playing these videotapes without the prior meeting, without the testimony about it, without the defense cross-examination. So that risk is presented here by the replay of these videotapes. What do you think the harm is? Well, I think the harm obviously was that it deprived the defendant of a fair trial. I mean, these tapes were central to the government's case. The government told them, you know, this is the most important thing, you can see what he did, and that's how he runs his practice. And I think that's an important point, too. You can see how the defendant ran his practice. It's not just here's what happened in these particular instances, but this is what he did, and you can infer that this is what he did throughout every meeting. Is your argument that if the requested instruction had been given, the jury likely would have come to a different verdict? Yes. Yes. I mean, I certainly think we cannot have confidence that that would not have occurred. And in this case, where this is a very difficult case. I mean, this is not a case where, you know, it's a bank robbery where you've got a dye pack and then mark bills and, you know, the evidence is overwhelming. This is a case where the jury had to decide the fine line. Did this doctor cross the fine line between legitimate medical practice and illegally distributing drugs? And that requires interpretation. How long were the jury out? How long did it deliberate? They were out, I believe, about a day and a half, two days, maybe two days in total. And they ultimately hung on several of the counts, counts that did not have the undercover recordings, indicating that they did struggle with this case and that they struggled with going home. But did they hang on all the counts without the undercover recording? They convicted on some counts of the undercover recordings and some counts didn't have the recording. So doesn't that indicate that they carefully looked at the evidence and weren't unduly influenced by anything? Well, I think what it actually reflects is the difficulty of the case. They did convict on every count that had the undercover recording. So I think clearly they were influenced by those undercover recordings. As to the counts that did not have the undercover recordings, their verdicts were mixed. They or their lack of the verdicts were mixed. On some counts they did convict and on others they hung. And I think what that really reflects is this is a very difficult case to determine. Well, you know, did the doctor know? Did he know that this person didn't have pain? Did he know, did he intend to prescribe outside the course of medical practice? And that's such a difficult interpretation question that it obviously came down to, you know, factors of credibility, what happened during these individual sessions. And they were not able to reach a verdict across the board. So I think that in this case the fact that there were these mixed verdicts or lack of verdicts on all the counts really indicates that just the difficulty of the case, the closeness of the case, and the harmfulness of this error. With the Court's permission, I'd like to reserve the remaining minute for rebuttal. Thank you. Let's hear from the government. Stephanie Christensen for the United States. I want to start by just clarifying the factual record with regard to the counts of conviction in this case. I note that five of the 13 convictions were unrelated to the undercover operations or the undercover recordings at work. Well, unrelated is a strong word. Your adversary just made the point that if the tapes are heard and understood, they provide a basis for an inference that this is the way he practices, which would then support the other counts. Your Honor, I would dispute that in so much as the jury was specifically instructed in this case that it must consider each distribution, each count in the indictment as a separate offense and must consider the evidence as to each separately. Yes, I understand that, but the point remains. And I note that in this case, Your Honor, you have very powerful testimony from the non-law enforcement witnesses in this case. And those, many of those, five of those led to the convictions. And what you have is these customers coming in and testifying and telling the jurors exactly what was happening to them. That's a separate and legitimate point, but I want to say that the tapes cannot be seen as unrelated to the other counts. They are related. The strength that comes from them may be assessed differently and so on, but unrelated is too strong a word for me. Your Honor, I would agree in so much as the customers are coming in and they're saying the same things that the undercover officer said, and they're saying the same things that were seen by the jurors on the videotape because this is how defendant ran his business, how he dealt his drugs in terms of handing out these prescriptions for cash, Your Honor. So it's repetitive in that sense. Counsel, do you take issue with opposing counsel's representation that every count that involved the videotapes resulted in a conviction? Your Honor, I don't. I don't. It is true that the jurors convicted on each of those counts. The jurors only asked to rehear three of the four recordings in this case, and so one of the undercover counts that was charged and that the jurors convicted on was not even played back in this case. So you really do have a situation where the jurors are convicting on some customer counts, on some undercover counts, and they're hanging on four of those counts. And I note that as to two of the four hung counts, the distributees, the customers, were dead and were unavailable to come in to testify about what happened in that examination room. As to Alex Clyburn, I'm sorry, Your Honor? Were you counsel that the district court should have given the instruction that was requested by the defendant? Well, let me say this. I was trial counsel in this case, and I did propose to the district court, along with defense counsel, that the instruction should be given. Was it error? No. And it was not error because if you look at what happened in this case and at the progression of this court's case law, you can see that the harm that Judge Wu was trying to prevent really, or that the cases are trying to prevent, just isn't present here. What you have is, presented by defendant, no case where this court has ever said it's per se reversible error to fail to give an undue emphasis instruction, either in the train and script context or in this very different context. This is kind of obvious. It really is kind of obvious that if both parties ask for the instruction to be given, and our case law consistently says if there's a readback, if there's a playback, this instruction should be given. It's pretty obvious in our law that that's pretty much not a requirement, but it's a pretty strong hint that this instruction should be given. Well, I would make three points in response to that, Your Honor. First of all, I think this case law is very clear that there is a discretion here. It's an abuse of discretion standard. It's not just failure to give the instruction automatically leads to reversal. So if there is some discretion, the question is how is the district court able to exercise it? And I think that in this case, the district court undertook a very thorough examination, not only of the other precautions it could take, but also what exactly was happening with the jurors in this case. And defense counsel actually agreed, I just want to take you through briefly, that the district court did take precautions in terms of having the jurors come back into the open courtroom to play these takes and playing them just once and instructing the jurors when they were given the English language transcripts once again, that those are not evidence, that it's the actual recordings. And I think that point with regard to those precautions is very important because if the court looks back at its case law in terms of protecting against errors for playback of videos or audio recordings, for example, in the wiretap context, you see that the concern is really that of Rule 43, defendants present, presence while a critical stage of the proceedings is going on. But it's also important that no piece of evidence be emphasized over another piece of evidence. And opposing counsel pointed out that the government in closing argument emphasized these tapes. So why wouldn't it be important for the court to caution the jury about that in so much as the government had emphasized these tapes in closing argument? I know, Your Honor, that I did emphasize many things in closing argument, and I can take you through some of them. But before I leave this point, I would just ‑‑ Was the videotapes one of the things you emphasized? Absolutely, Your Honor. Absolutely. And I note that when you look at these undue emphasis cases in the context of transcripts, you'll see that, Richard, there was a real concern on the part of the court there because the jurors had actually asked for a specific part of testimony. The jurors had indicated that they were, in fact, placing undue emphasis on this. And you see this. The jurors asked for a specific portion. They wanted to hear right around the time she was being asked to identify the defendant. And this is the sole witness that puts defendant with the gun. That's the thing with Hernandez. Why doesn't that mean that the jury in this case was putting emphasis on the videotapes as opposed to the other evidence in the record? That's a great question, Your Honor. And I note that the parties who were there, the district court and defense counsel, agreed as to why the jurors were asking. And I'll just read the court this, which is that excerpt of record 232 through 33. The court says, you know, the reason it would seem to the court that they are asking for this is that both sides, in closing arguments, referenced these videotapes and made representations, et cetera. And so, therefore, it's not surprising that the juror wants to hear them again since the jury did not have those contentions of the parties at the time. Defense counsel, I don't dispute that. I don't dispute the court's analysis of why they want this evidence. And the court goes on to say that these tapes are very difficult to understand. And then, very importantly, something that's not present in any of this court's case law, again, with regard to the transcripts, and here I do think that the play of the exhibits is very different than transcripts, and the concerns are very different. For example, with regard to transcripts, this court has noted that the transcripts can contain errors, so you have to be careful when you're having this readback of transcripts and that they can't reflect demeanor and tone of voice. And it's one of the reasons why this court has said, look, you should admonish the jury not to place undue emphasis, because it's a readback. It's not the same as the trial testimony. But, again, Judge Wu here made the finding. And that's not the reason that you give that instruction. The reason that you give that instruction is because it's the last thing the jury hears, and they've obviously asked for one piece of evidence, as opposed to all of the evidence that they're supposed to consider. And so as a trial judge, you want to make sure that just because this is the piece of evidence they've asked for, that they don't focus on that to the exclusion of all the other evidence. That's absolutely right, Your Honor. And I think there's something unique in this case about the fact that back in the jury room, the jury has all of the exhibits that the government has admitted in a Redweld, but they don't have these tapes which were admitted and should have been in the Redweld. The court brings them back out and plays them in open court. So the jury has evidence that is admitted, that's discussed by both parties in closing arguments, and it's not with the rest of the evidence back in that jury room. When the tapes were replayed, did the jury also see at the same time the transcripts? They did, Your Honor. They were, to be clear, in the video exhibits, the transcript, the English-language transcript ran to the rose. It was just like subtitles. Absolutely, Your Honor. And that was per agreement with defense counsel. And did the judge during the playback repeat any instruction vis-a-vis what you hear prevails over what you read? Your Honor, the district court did instruct the jury again that the transcripts are not evidence. He did take that precaution and specifically told the jurors that the transcripts are not evidence. I know he did that at least with regard to the initial playing of those transcripts, and I believe he did that with regard to the replay of them, but I didn't want to misrepresent that. What bothers me about this case is not something that you did or made a mistake as to, what bothers me is that it's so easy to give the instruction that says, don't place undue emphasis on this. You're right, Your Honor. If you asked for it, the other side asked for it, it would have taken 30 seconds to give the instruction, much longer than it took the judge to explain that he wasn't going to give it. I don't understand why the judge didn't give it. Your Honor, I will say that I did ask the court to give this instruction, and as much as I love coming to Pasadena, it would have been better for me had he given the instruction. But the real question here is, was it an abuse of discretion not to? And I think the answer is no. Well, counsel, what if we disagree with you? If we disagree with you and we determine that the district court, I'm just speaking for myself, I don't know how my colleagues feel about this, but if we disagree with you and say that the district court abused his discretion, why was any error harmless? For several reasons, Your Honor. First of all, I know that it only impacts three of the four recordings, and so there's only seven of the 13 counts impacted. I will say that the jurors heard the testimony from the undercovers aside from the tapes. These were just short excerpts of the hours-long recordings that happened from when that undercover walked into the office and waited in the crowding waiting room and then went in to see the defendant, and heard testimony from all three of those undercovers, many of whom were in the examination room at the same time. So the incidents of the visits in the exam room were corroborated by the actual testimony of other undercovers. The jurors also presented with defendants' prescribing history, had the actual patient files where they existed for these undercovers, so they could look through and see for themselves exactly what defendant did or, more importantly, did not do with regard to these patients. They had the prescriptions, the actual physical prescriptions in this case, which showed defendant prescribing these very high doses of this very dangerous drug to these undercovers. They heard the expert testimony regarding the standard of care and the expert's assessment of having watched not just the excerpts, but the entirety of each of those videos and concluding that each of these was outside of the scope and that it was, quote, pure drug dealing. They also heard the testimony from the case agents who were undertaking those undercover operations and directing them, giving the corroborating evidence of the surveillance that they were conducting outside of the clinic with regard to the number and types of people who were around the clinic at that time. And they also saw this street drug price list. This was Government's Exhibit, I believe, 48. This was a list that defendant had in his office where he listed, it actually had listed all the different street drug prices using drug slang and how much they went for, Coke, meth, Oxy, Vicodin. And so he knew exactly what to charge for these prescriptions based on what the going street value was for these drugs, which is really egregious and really important evidence. They also heard defendants... Counsel, would you agree with opposing counsels that despite all of the other evidence you've described, the tapes were the primary evidence against the defendant? I would not, Your Honor. My list goes on in terms of everything that the government presented at this trial. I would say with regard to, you know, defendant's intent, which is a point that defense counsel makes. She says, you know, intent is the real issue here. How do you know that defendant intended to prescribe outside the usual course of professional practice and without a legitimate medical purpose? And the jurors had lots of evidence of that because they had his post-arrest statements where he told... He lied about what happened in comparison to when the customers took the stand and to his patient files. He denied knowing or prescribing to some of the patients that he ultimately did prescribe to. And then, importantly, defendant took the stand in this case. And certainly he didn't have to. He had a right not to, but he did. And he took that stand and he got up there and he made clear his intent through some of his rather ludicrous statements. He said things. He told the jurors, for example, that ibuprofen was safer than oxycodone. He... Isn't it? Excuse me, Your Honor? Ibuprofen isn't safer than oxycodone? I'm sorry. He said that oxycodone was safer than ibuprofen, Your Honor. And he's building this case. He's saying things like, I don't need to do examinations. I can know just by looking at them. So the jurors had plenty of evidence of his intent aside from just those tapes. And, again, the undercovers were there and they were cross-examined not only as to the excerpts but to the entirety of those undercover meetings. So it really is harmless. Aside from that, you know, the plethora of evidence, I would note two things. One, again, the jury didn't convict on all the counts. There were selected verdicts in this case, which this Court has said in other contexts is certainly indicative of a jury's ability to compartmentalize. And, second, there was a significant delay from the time these playbacks happened to the time the jury reached its verdict. There was over a day and a half, and, in fact, in other contexts, this Court has noted that this delay in time will show that this was the recordings alone or the playbacks were not the cause of these jurors coming back and finding this defending guilty. Thank you, Your Honors. Thank you very much. Ms. James, you've saved some time. Why don't we start with a minute, but we won't cut you off. Okay. I'll pick up on the last point first, which is really the harmlessness of this error and whether it can be considered harmless in this case. And the answer to that is just no. And this is a harmless error analysis, and we're not contending this is a structural error that's per se reversible, but you do have to look at could the – is it more probable than not that this did not impact the verdict? And you just can't say that in this case. In this case, it's not a question of whether there is any other evidence. What if we were to conclude that you're right as to harmless as to the counts that are directly supported by the tapes, but not as to the counts that are not directly supported by the tapes? How many counts would then remain, and what would be the likely sentence for those counts that would then remain? Well, there would be five remaining counts. I believe the number is five. I'm sorry, I didn't hear you very well. Sorry. I believe the counts would be – there would be five remaining counts with the non-undercover recordings. I think I'm understanding the question. Not agreeing with the premise, but if that were the case, would it have impacted the sentence? I don't think there's any way to know because – It just has to be remanded for resentencing. I think it would certainly have to be remanded for resentencing at a minimum, and of course there are other arguments which we have not gotten to about why it should be remanded for sentencing. But I also would say that even as to those counts, I don't think you can say that you can say it's only harmless – I mean, it's harmless as to the non-undercover recording tapes because the real problem with those tapes and playing those tapes during deliberations was the overarching message. And again, you know, the government didn't focus on this as, oh, you know what happened in these recordings, in these meetings because of what you saw. This is how he ran his practice. So there was definitely an inference to be drawn here that this is how the defendant interacted with his patients as a general matter. So again, looking at it from a harmless error standpoint, how can we possibly say that that did not influence the jury in their assessment on the other counts as well? And I am running – I'm over my time. If the court has any other questions on any of the issues, I'd be happy to answer them. Thank you. Thank you both sides for very good arguments in this case. The United States v. Mamdad now submitted for decision. The next case on the argument calendar this morning, Rodriguez-Lugo v. United States.
judges: Goodwin, Fletcher, Rawlinson